## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANTHONY BRUSCO,

    *Plaintiff*,

    v.

WIP MOONACHIE LLC, et al.,

    *Defendants*.

Civil Action No. 18-1961

OPINION

ARLEO, UNITED STATES DISTRICT JUDGE

THIS MATTER comes before the Court by way of Defendants WIP Moonachie LLC's ("WIP") and Woodmont Industrial Partners LLC's ("Woodmont" or, with WIP, "Defendants") Motion for Summary Judgment on Plaintiff Anthony Brusco's ("Anthony" or "Plaintiff") claims. ECF No. 71. Plaintiff opposes the Motion, ECF No. 78, and cross-moves for summary judgment as to Count I of his Complaint and Defendants' counterclaims, ECF No. 72. For the reasons that follow, Defendants' Motion is **GRANTED**, and Plaintiff's Motion is **GRANTED IN PART and DENIED IN PART**.

I.    FACTUAL BACKGROUND[1]

This matter involves a dispute over $900,000 held in escrow following the sale of commercial real estate at 77 Moonachie Avenue, Moonachie, New Jersey (the "Property"). See generally Compl., ECF No. 1; Ans. with Counterclaims, ECF No. 10.[2]

---

[1] The facts are drawn from Defendants' Statement of Material Facts ("Def. SOMF"), ECF No. 73, Plaintiff's Statement of Material Facts ("Pl. SOMF"), ECF No. 72.52, Defendants' Response to Plaintiff's Statement of Material Facts ("Def. Resp. to Pl. SOMF"), ECF No. 81, and Plaintiff's Response to Defendants' Statement of Material Facts and Supplemental Statement of Material Facts ("Pl. Resp. to Def. SOMF"), ECF No. 78.1. The Court notes any disputes.

[2] The Court refers to the first eight pages of the Answer with Counterclaims as the "Answer" and the remaining pages as the "Counterclaim."

Prior to the sale at issue in this litigation, 77 Moonachie Owners Corp. ("Owners Corp.") owned the Property and leased it to a printing company, Earth Color, Inc. ("Earth Color" or the "Tenant").[3]  Def. SOMF ¶ 1.  Plaintiff, his son Nicholas Brusco ("Nicholas"), and other members of the Brusco family owned and operated Owners Corp.[4]  Id.

In early 2016, Earth Color moved its operations to Parsippany, New Jersey, while still maintaining the Lease on the Property, and Owners Corp. put the Property up for sale.  Id. ¶ 5. Benjamin Rosen ("Rosen"), Director of Acquisitions for Defendants, investigated the potential purchase of the Property in the spring of 2016.  Id. ¶¶ 6-7.

On March 29, 2016, Nicholas sent Rosen an email laying out "three purchase options to consider."  Id. ¶ 8.  "Option 1" involved a sale of the Property, with no tenant, for $7,600,000.  Id. "Option 2" involved retaining Earth Color as a tenant, with $8,100,000 due at closing, plus $1,000,000 paid in twenty-four monthly installments "for each month that Earth Color . . . continues to pay its full rent under the existing lease."  Id.  "Option 3" provided that Owners Corp. would "work out [a] lease buy-out with Earth Color to deliver [the Property] free of tenant," and that if the sale could close before August 1, 2016, the purchase price would be $7,600,000, and if the sale could not close before August 1, free of the Tenant, then the deal would convert to Option 2.  Id.; see also Santola Decl., Ex. B (the "March 29 Email"), ECF No. 71.3.

On March 31, 2016, Owners Corp. selected Option 2 and entered into a letter of intent to sell the Property to Defendants subject to the Lease, for a purchase price of $8,100,000 at closing and $1,000,000 in quarterly installments.  Def. SOMF ¶ 10; Santola Decl., Ex. C (the "LOI").  The LOI provided Defendants with twenty-five days to conduct due diligence on the purchase (the

---

[3] In April 2013, Owners Corp. and Earth Color entered into a lease extension through March 31, 2025.  See Def. SOMF ¶ 3; Santola Decl., Ex. T (the "Lease"), ECF No. 71.4.

[4] Earth Color employed Nicholas as President of one of its divisions.  Def. SOMF ¶ 1.

"Diligence Period").   Def. SOMF ¶ 11.[5]   Defendants conducted extensive diligence on the Property.  See Pl. SOMF ¶¶ 8, 12-17 (explaining that Defendants "prepared detailed analyses for multiple purchase scenarios including purchase of the Property with a paying tenant, with the tenant failing to pay any rent at all post-closing, and with Tenant filing bankruptcy" and "openly discussed" these options with Owners Corp.), 24-26 (describing contacts between Defendants and the Tenant during the Diligence Period).

On April 21, 2016, Nicholas forwarded Defendants a proposed Lease termination agreement from Nate Modugno ("Modugno"), Earth Color's Chief Financial Officer ("CFO"), under which Earth Color would pay $2 million to end the Lease (the "Proposed Termination Agreement").  Def. SOMF ¶ 12; see also Santola Decl., Ex. D (the "April 21 Email").[6]

On or about May 6, 2016, Woodmont and Owners Corp. entered into a sales agreement to purchase the Property.  Def. SOMF ¶ 17; Santola Decl., Ex. A (the "Sales Agreement").  Section 1.2 of the Sales Agreement sets the purchase price at $9,100,000 "if the Lease remains in effect at the closing" or $7,600,000 if, before the closing, "[Owners Corp.] and [Earth Color] enter into an agreement for the termination of the Lease," and Earth Color vacates the Property.   Sales Agreement § 1.2(a).  Provided that Earth Color terminated the Lease, Owners Corp. was "entitled to receive and retain exclusively for its own account any and all consideration payable . . . in connection with any Lease Surrender Agreement."  Id.  Owners Corp. also "advise[d]" Woodmont that it "w[ould] seek approximately $2,000,000 of such consideration from [Earth Color] (although

---

[5] The parties subsequently extended the Diligence Period beyond twenty-five days.  Def. SOMF ¶ 11.

[6] Defendants assert that Nicholas "did not disclose" that "Modugno lacked authority to enter into this purported Termination Agreement because Bank of America was actually in control of Earth Color."  Def. SOMF ¶ 13.  Plaintiff admits this fact but disputes that it "is material to the claims at issue in the instant motion."  Pl. Resp. to Def. SOMF ¶ 13.  Subsequently, on May 13, 2016, Nicholas wrote to Modugno that Earth Color "can have no contact with" Defendants.  Def. SOMF ¶ 16; Kaller Decl., Ex. F, ECF No. 71.7.

the final amount may be more or less)" and "[Woodmont] shall not have . . . any interest in any such consideration."  Id.

The Sales Agreement included a "deferred payment provision," under which Woodmont would place a $900,000 letter of credit in escrow if the Lease remained in effect at closing (the "Escrow Fund").  Def. SOMF ¶ 19; Sales Agreement § 12.23(a)-(c).[7]  Woodmont agreed to pay Owners Corp. the $900,000 over "eight quarterly installments" while Earth Color continued to pay rent (the "Quarterly Payments").  Sales Agreement § 12.23(c).  The Quarterly Payments were immediately due in full if, among other things, "the Lease [was] terminated or surrendered in whole or in part pursuant to a written agreement between [Earth Color] and [Woodmont]" or "[Woodmont] [sought] a warrant or court order for the eviction or dispossession of [Earth Color] . . . unless [Woodmont] ha[d] timely commenced and thereafter diligently and continuously pursue[d] through all appeals . . . the legal proceeding to recover past due Base Rent described in Section 12.23(e)," subject to certain limited exceptions.  Id. § 12.23(d) (emphasis in original).  The DPA would suspend the Quarterly Payments if Earth Color failed to pay any rent due, provided Woodmont promptly sent Earth Color a default notice and timely commenced a legal proceeding to collect the rent owed.  Id. § 12.23(e).[8]

---

[7] Consistent with the parties' terminology, the Court also refers to Section 12.23 of the Sales Agreement as the "Deferred Payment Agreement" or "DPA."

[8] Section 12.23(f) provides that if the Tenant defaults, any rent collected via a legal proceeding or "a good faith settlement or resolution" is to be split 50/50 between Owners Corp. and Woodmont, after payment of "all actual, reasonable out-of-pocket costs (including legal fees) incurred."  Sales Agreement § 12.23(f).  Payments to Owners Corp. under this provision are capped when the sum of the previously-paid Quarterly Payments and Owners Corp.'s share of any rent collected reaches $900,000.  Additionally, if the Tenant and Woodmont enter into any written agreement to terminate the Lease, then Owners Corp. is entitled to 50% of the proceeds of the termination agreement, up to $900,000.  Id. § 12.23(g).  If the Tenant's "obligation to pay all future remaining and past due rent under the lease is forgiven, absolved or released" through the legal proceedings or good-faith settlements described in Sections 12.23(d)-(g), then Woodmont "shall have no obligation to pay [Owners Corp.] the remaining Quarterly Payments."  Id. § 12.23(h).

On June 22, 2016, the parties closed on the Property and Owners Corp. assigned the Lease to Defendants.  Santola Decl. ¶ 29, ECF No. 71.2.  On that same day, Woodmont assigned its rights under the Sales Agreement to WIP.  Pl. SOMF ¶ 3.

On July 1, 2016, Earth Color failed to pay rent.  Def. SOMF ¶ 27.  On July 15, 2016, Defendants issued to Earth Color a demand for payment of outstanding rent.  Id. ¶ 28; see also Santola Decl., Ex. H (the "Demand for Payment").  Based on contemporaneous emails dated July 11, 2016, Earth Color indicated to a WIP employee that it had "no intention of paying July Rent." Santola Decl., Ex. I at WIP000858; Santola Decl. Ex. J at WIPGRS000010.  By letter dated July 25, 2016, Defendants informed Earth Color that it was in default and that Defendants were terminating the Lease.  Def. SOMF ¶ 29; see also Santola Decl., Ex. K (the "Termination Letter").[9]

On August 9, 2016, Defendants filed an action for possession of the Property, and on September 10, 2016, they filed an action for rent collection under the Lease in the Superior Court of New Jersey, Bergen County (the "Superior Court").  Def. SOMF ¶ 30.  Defendants kept Owners Corp. "apprised of the status of" these actions, Def. SOMF ¶ 35, and, because Defendants viewed Earth Color as in default, did not make the Quarterly Payments to Owners Corp., id. ¶ 32.

On August 25, 2017, while its rent collection action against Earth Color was ongoing, Defendants sold the Property to a third party.  Id. ¶ 37.

By letter dated September 8, 2017, Earth Color's bankruptcy counsel indicated that the company had over $50 million in secured debts and unsecured claims of approximately $11 million.  Id. ¶ 38; Santola Decl., Ex. O (the "September 8 Letter").  Defendants determined that their only possibility of recovery was to settle the rent collection action or to pursue a claim for successor liability against Mittera, the entity purchasing Earth Color's assets in bankruptcy.

---

[9] Plaintiff argues that the Termination Letter breached Sales Agreement Section 12.23(d)(i).

See Def. SOMF ¶¶ 39-41, 43.  In October 2017, Defendants alerted Owners Corp. to this situation and indicated that they would pursue a settlement with Earth Color.  Id. ¶ 43.

By letter dated October 31, 2017, Defendants informed Owners Corp. that they had reached a settlement with Earth Color for $142,500.  Id. ¶ 45; Santola Decl., Ex. Q.  The settlement was executed on November 1, 2017.  Def. SOMF ¶ 45; Santola Decl., Ex. R (the "Settlement Agreement").  Owners Corp. objected to the Settlement Agreement, Def. SOMF ¶ 50,[10] and on November 3, 2017, counsel for Owners Corp. requested that the escrow agent release the $900,000 to Owners Corp., Compl., Ex. G (the "November 3 Letter").  Owners Corp. subsequently dissolved and assigned its rights to Plaintiff.  See Compl. ¶ 4.

## II.    PROCEDURAL HISTORY

Plaintiff filed this action on February 12, 2018.  See Compl.  The Complaint asserts three causes of action: (1) breach of the Sales Agreement flowing from Defendants' termination of the Lease, id. ¶¶ 25-45 ("Count I"); (2) fraudulent inducement, id. ¶¶ 46-52 ("Count II"); and (3) unjust enrichment, id. ¶¶ 53-57 ("Count III").

On April 11, 2018, Defendants filed an Answer with two counterclaims.  See ECF No. 10.  The first counterclaim alleges that Plaintiff committed fraudulent inducement by representing that Earth Color would either continue to pay rent or was willing to pay over $1 million to terminate the Lease.  See Counterclaim ¶¶ 23-26 ("Counterclaim I").  The second counterclaim alleges tortious interference with the Escrow Fund and Defendants' Letter of Credit.  Id. ¶¶ 27-31 ("Counterclaim II").

---

[10] Defendants claim they did not receive this objection until November, even though it was allegedly communicated via a letter dated October 17, 2017.  See Def. SOMF ¶ 50.

Following discovery, Defendants moved for summary judgment on Counts I-III.  See ECF No. 71.  Plaintiff opposed this Motion, ECF No. 78, and cross-moved for summary judgment on Count I and Counterclaims I-II, ECF No. 72.  Defendants opposed Plaintiff's Cross-motion.  ECF No. 79.

## III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

The Court construes all facts and inferences in the light most favorable to the non-moving party.  Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)) (internal quotation marks omitted).

## IV.   DISCUSSION

### A.   Breach of Contract (Count I)

Defendants argue they are entitled to summary judgment on Count I because they did not breach the Sales Agreement.  Def. Br. at 30-35, ECF No. 71.1.  The Court agrees.

To establish a breach of contract claim under New Jersey law, "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." Murphy v. Implicito, 392 N.J. Super. 245, 265 (App. Div. 2007). There is no dispute that the parties entered into an enforceable contract here, namely the Sales Agreement. At issue is whether the Termination Letter, Defendants' subsequent legal actions, and their failure to make the Quarterly Payments breached the DPA.

"[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." Tamarind Resort Assocs. v. Gov't of Virgin Islands, 138 F.3d 107, 110 (3d Cir. 1998) (internal quotation marks and citation omitted). "In determining whether contractual language is ambiguous, courts should consider the contract language, the proffers of the parties, and the extrinsic evidence offered in support of each interpretation," Local Union No. 1992, IBEW v. Okonite Co., 189 F.3d 339, 343 (3d Cir. 1999), and a term is unambiguous "if it is reasonably capable of only one construction," Tamarind Resort, 138 F.3d at 111. Additionally, "[a]n interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Subaru of Am., Inc. v. DDB Worldwide Commc'ns Grp., Inc., No. 08-6218, 2010 WL 1257732, at *2 (D.N.J. Mar. 25, 2010) (citing Restatement (Second) of Contracts § 231).

Here, it is undisputed that Earth Color failed to pay rent in July 2016, constituting a default under the Lease. See Def. SOMF ¶¶ 27-28; Pl. Resp. to Def. SOMF ¶¶ 27-28. After issuing the Demand for Payment and providing ten days to cure, Defendants terminated the Lease and instituted proceedings in the Superior Court to take possession of the Property and collect rent.

Def. SOMF ¶¶ 29-30; see also Termination Letter.  Plaintiff argues that, by terminating the Lease, the Quarterly Payments became immediately due under Section 12.23(d) of the Sales Agreement, which provides: "If, at any time or for any reason: (i) the Lease is terminated or surrendered in whole or in part . . . then . . . subject to the provisions of Sections 12.23(f), (g), and (h), [Defendants] shall immediately pay all of the unpaid Quarterly Payments" to Owners Corp.  Sales Agreement § 12.23(d)(i).  Because Defendants did not make the Quarterly Payments, Plaintiff asserts, they breached the Sales Agreement, entitling him to damages.  See Pl. Br. at 8, 13-15.[11]  Defendants counter that, because of Earth Color's default, they were not obligated to make the Quarterly Payments and that they complied with Sections 12.23(e)-(h) of the Sales Agreement in pursuing the rent collection action in Superior Court.  See Def. Br. at 31-35.  The Court agrees with Defendants.

Section 12.23(d)(iv) provides that the unpaid Quarterly Payments are immediately due to Owners Corp. upon Defendants seeking

> a warrant or court order for the eviction or dispossession of Tenant . . . unless [Defendants have] timely commenced and thereafter diligently and continuously pursue[] through all appeals (and as a matter of law may continue notwithstanding any such eviction or dispossession) the legal proceeding to recover past due Base Rent described in Section 12.23(e).

Sales Agreement § 12.23(d)(iv) (emphasis in original).

Section 12.23(e) then explains that when the Tenant "fail[s] to pay any rent payable under the Lease," Defendants must "promptly send to Tenant any and all default notices as required under the Lease and thereafter promptly commence and thereafter diligently and continuously

---

[11] Plaintiff also argues that Defendants' Superior Court lawsuits and surrender agreement with Earth Color breached Sales Agreement Section 12.23(d)(iv), which provides, in part, that if Defendants "seek a warrant or court order for the eviction or dispossession of Tenant . . . including as a remedy or alternate remedy for any default by Tenant under the Lease," then Defendants "shall immediately pay all of the unpaid Quarterly Payments."  See Sales Agreement § 12(d)(iv); Pl. Br. at 11-12.  For the reasons explained infra, the Court concludes that these were permissible actions under Sections 12.23(e)-(g).

(through all appeals) pursue a legal proceeding in a court with appropriate jurisdiction to require Tenant to pay all past due rent." Id. § 12.23(e). Defendants must also "keep [Owners Corp.] apprised of the status of such legal proceeding[s]." Id. Here, Defendants complied with each of these requirements. Following Earth Color's default, Defendants sent the Demand for Payment and Termination Letter, as contemplated by the Lease, and initiated proceedings to retake possession and collect rent due, as contemplated by Section 12.23(e). Def. SOMF ¶¶ 27-30. They kept Owners Corp. apprised of these proceedings. Id. ¶ 35. By the Sales Agreement's plain terms, because Defendants complied with Section 12.23(e), they were not required to make the Quarterly Payments. See Sales Agreement § 12.23(e) ("For so long as [Defendants] diligently and continuously pursues such legal proceeding through all appeals until all past due rent payable under the Lease is paid in full, the Quarterly Payments to [Owners Corp.] shall be suspended (commencing with the date Tenant defaults in making payments of its rent required to be paid pursuant to the Lease) until further payment is to be made pursuant to the following provisions of this Section.").

That Defendants terminated the Lease before initiating the Superior Court proceedings for possession and rent collection, see Pl. Br. at 14-15, is not dispositive. Defendants terminated the Lease as part of "promptly commenc[ing] and thereafter diligently and continuously (through all appeals) pursu[ing] a legal proceeding in a court with appropriate jurisdiction to require Tenant to pay all past due rent," Sales Agreement § 12.23(e), which Defendants did just two weeks after sending the Termination Letter, see Def. SOMF ¶ 30 (noting that Defendants commenced action to retake possession of the Property on August 9, 2016). Under New Jersey law, before a lessor of commercial property may recover for breach of a lease, they have a duty to mitigate their losses by making "reasonable attempts to relet the premises." McGuire v. City of Jersey City, 125 N.J.

310, 320 (1991).  Defendants could relet the Property only after they terminated the Lease and regained possession.  See, e.g., Crescent Trading, LLC v. Chera, No. L-8868-05, 2010 WL 3932892, at *10 (N.J. Super. Ct. App. Div. Oct. 4, 2010) (noting that "earliest" lessor "could have re-let the premises" to mitigate damages began when tenant "relinquished possession of the premises"); Jaasma v. Shell Oil Co., 412 F.3d 501, 512 (3d Cir. 2005) (analyzing whether landlord "exercise[d] the requisite diligence in attempting to market the property for lease or sale after the termination of the lease").

To find that the Quarterly Payments automatically became due when Defendants terminated the Lease, see Sales Agreement § 12.23(d)(i), would frustrate the purpose of Section 12.23(e), which suspends the Quarterly Payments during the pendency of "a legal proceeding . . . to require Tenant to pay all past due rent," id. § 12.23(e).  Such an interpretation conflicts with traditional principles of contractual interpretation, which seek to give effect to each term.  See Subaru, 2010 WL 1257732, at *2 ("An interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") (citation omitted); Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009) ("A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner.") (emphasis added).

Moreover, Section 12.23(d)(i) is "subject to the provisions of Sections 12.23(f), (g), and (h)."  Those provisions explicitly reference "the legal proceeding described in the preceding Section 12.23(e)" in explaining when the Quarterly Payments are extinguished and how proceeds of a rent collection action or good-faith settlement should be divided between Defendants and Owners Corp.  See Sales Agreement § 12.23(f)-(h).  Accordingly, by considering Section 12.23 in its entirety, the Court concludes that the Termination Letter did not automatically make all the

Quarterly Payments due because termination of the Lease.   Rather, it was consistent with Defendants' subsequent actions to "promptly commence and thereafter diligently . . . pursue a legal proceeding . . . to require Tenant to pay all past due rent."  Id. § 12.23(e).

Nor did Defendants breach the Sales Agreement in settling the rent collection proceeding with Earth Color for $142,500.  See Def. SOMF ¶ 45.  Section 12.23(f) provides that if the Tenant defaults "in its payment of any of the rent due and payable on the Lease" and Defendants subsequently "collect any such past due rent from Tenant, whether via a proceeding as described [in Section 12.23(e)] (including a good faith settlement or resolution . . . or by [Defendants'] good faith agreement to or acceptance of a rejection of the Lease in any bankruptcy of Tenant)," then Owners Corp. is entitled to "fifty percent . . . of the amount by which the aggregate amounts of the past due rent collected by [Defendants] exceeds the aggregate amount of all actual, reasonable out-of-pocket costs (including legal fees) incurred."  Sales Agreement § 12.23(f) (emphasis added).

While the Sales Agreement does not define "good faith settlement," Defendants have offered evidence, which Plaintiff does not appear to dispute, that Earth Color filed for bankruptcy and faced more than $50 million in secured claims and $11 million in unsecured claims.  See Def. SOMF ¶ 38; September 8 Letter at WIP00591.  Earth Color's bankruptcy counsel explained that "absent a transaction with Mittera, the recovery to unsecured creditors," like Defendants, "would be zero."  September 8 Letter at WIP00591.  Earth Color initially offered $30,000 to settle the rent collection action, equal to less than half of one month's rent.[12]  See Def. SOMF ¶ 42.  Defendants were able to negotiate up to $142,500, which they concluded was preferable to continued litigation, especially because any judgment reached after Earth Color's imminent bankruptcy would likely be very difficult to collect.  See Def. SOMF ¶¶ 41-45.  On these facts, the Court concludes that the

---

[12] Earth Color's monthly rent under the Lease was $68,125.  See Demand for Payment at 2.

$142,500 settlement was reached in good faith.  See also Strougo v. Ocean Shore Holding Co., 457 N.J. Super. 138, 157 (Ch. Div. 2017) (noting that public policy suggests upholding settlements "even without strong regard to the underlying consideration" because "settlement has long been preferred to litigation"); Vandergrift v. Pennsauken Sch. Dist., No. 12-7646, 2017 WL 6566139, at *9-10 (D.N.J. Dec. 22, 2017) (finding settlement was reached in "good faith" where parties were represented by counsel and where there was no evidence that parties were not "of sound mind," given "rational" positions "made on the record").  Because Earth Color and Defendants reached a good faith settlement which extinguished Earth Color's "obligation to pay all future remaining and past due rent under the Lease," Defendants "have no obligation to pay [Owners Corp.] the remaining Quarterly Payments."  See Sales Agreement § 12.23(h); see also Settlement Agreement ¶¶ 1-3.

For the reasons stated above, the Court concludes that Defendants did not breach the Sales Agreement as a matter of law and are therefore not liable for the Quarterly Payments of $900,000.[13]

## B.      Fraudulent Inducement (Count II)

Defendants argue that Plaintiff's fraudulent inducement claim fails as a matter of law.  Def. Br. at 35-41.  The Court agrees.

To establish a claim for fraudulent inducement, "five elements must be shown: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment."  RNC Sys. Inc. v. Modern Tech. Grp. Inc., 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (citing Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 624 (1981)).  However, the

---

[13] Defendants incurred $65,000 in costs to pursue the rent collection action and the Settlement Agreement.  See Def. SOMF ¶ 47.  They concede that Plaintiff is therefore entitled to half of the remaining $77,500, or $38,750, pursuant to Sales Agreement § 12.23(f).  See Def. Br. at 35.  Although Defendants apparently offered the $38,750 to Plaintiff, he has not alleged a breach nor sought payment of this amount in the present litigation.

"economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." Id. (citation omitted).  As such, a fraudulent inducement claim can only proceed "alongside breach of contract . . . [when] the tortious conduct is extrinsic to the contract between the parties." Id. (citation omitted); see also Montclair State Univ. v. Oracle USA, Inc., No. 11-2867, 2012 WL 3647427, at *4 (D.N.J. Aug. 23, 2012) (noting that "only those pre-contractual misrepresentations that are extraneous to the parties' contract may be brought alongside a breach of contract claim") (emphasis in original) (citation omitted).

Here, Plaintiff's fraudulent inducement claim is premised on the fact that Defendants "induced [Owners Corp.] to accept the deferred payment provisions in the Sales Agreement in order to reduce the payment due" at closing by "falsely representing that [Defendants] would perform their obligations under the provisions of the Sales Agreement related to collecting rent from the Tenant."  Compl. ¶¶ 47-48.  Rather than perform these obligations, Plaintiff alleges, Defendants entered into the Sales Agreement knowing "that they would enter into the Tenant Surrender [Agreement]" and "immediately resell or re-lease the [Property]." Id. ¶¶ 49-50.

Plaintiff has not provided evidence that Defendants intended to immediately re-sell or re-let the Property instead of collecting rent from Earth Color.[14]  Regardless, Defendants' alleged misrepresentations or intentions are not actionable in tort because they do not "breach[] a duty 'separate and distinct from the performance' of the [Sales] [A]greement's terms." Montclair State Univ., 2012 WL 3647427, at *5 (quoting Chen v. HD Dimension, Corp., No. 10-863, 2010 WL 4721514, at *9 (D.N.J. Nov. 15, 2010)); see also Sales Agreement § 12.23 (explaining Defendants obligation to collect rent from the Tenant, not terminate the Lease, and make the Quarterly

---

[14] Indeed, the Sales Agreement itself explains that it was Owners Corp. that would "seek approximately $2,000,000 of . . . consideration from Tenant" in connection with a "Lease Surrender Agreement" prior to the closing.  See Sales Agreement § 1.2(a).  Furthermore, Defendants paid a premium for the Property with the Tenant, as opposed to purchasing the Property vacant.  See id.; see also March 29 Email.

Payments to Owners Corp.).  Accordingly, Plaintiff's fraudulent inducement claim is barred by the economic loss doctrine and Defendants are entitled to summary judgment.  See RNC Sys. Inc., 861 F. Supp. 2d at 451-53 (finding fraudulent inducement claim barred by economic loss doctrine because the "purported misrepresentations [were] addressed squarely within the language of the License Agreement" and were "not unrelated to the performance of the contract").

### C.    Unjust Enrichment (Count III)

Defendants argue that Plaintiff's unjust enrichment claim fails as a matter of law.  Def. Br. at 41-45.  The Court agrees.

To establish an unjust enrichment claim, Plaintiff must show that Defendants "received a benefit and that retention of that benefit without payment would be unjust."  Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110 (2007) (citing VRG Corp v. GKN Realty Corp., 135 N.J. 539, 554 (1994).  This "quasi-contract doctrine also requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  Id. (citation omitted).

Plaintiff's unjust enrichment claim rests on allegations that Defendants unfairly profited by "deliver[ing] the [Property] vacant by entering into the Tenant Surrender," which "deprived [Owners Corp.] . . . of rents and the ability to collect the rents to which they were duly entitled under the terms of the Sales Agreement."  Compl. ¶¶ 55-56.  Here, Plaintiff neither alleges nor provides evidence of any action taken by himself or Owners Corp. that conferred a benefit on Defendants for which they did not pay.  Accordingly, Defendants are entitled to summary judgment.  See VRG Corp., 135 N.J. at 554-55.

To the extent that Plaintiff claims Defendants withholding the Quarterly Payments constitutes unjust enrichment, see Pl. Opp. Br. at 20-22, ECF No. 78, this argument is similarly unavailing.  "A plaintiff may not maintain an action for unjust enrichment based on deficient performance of a contract, the validity of which is undisputed."  Riachi v. Prometheus Grp., __ F. App'x __, 2020 WL 3867370, at *3 (3d Cir. July 9, 2020) (citing Winslow v. Corporate Express, Inc., 364 N.J. Super. 128 (App. Div. 2003)).  Here, Plaintiff does not dispute the validity of the Sales Agreement, so his parallel unjust enrichment claim fails as a matter of law.[15]  Id.

\* \* \* \*

For the reasons stated above, Defendants have established they are entitled to summary judgment on all of Plaintiff's claims.  The Court next turns to Plaintiff's Motion for summary judgment on Defendants' counterclaims.

## D.      Defendants' Counterclaims

Plaintiff argues that he is entitled to summary judgment because each of Defendants' counterclaims fail as a matter of law.  Pl. Br. at 15-24, ECF No. 72.53.  The Court finds that summary judgment in Plaintiff's favor is warranted only as to Defendants' tortious interference counterclaim.

### 1.      Fraudulent Inducement (Counterclaim I)

As previously noted, a fraudulent inducement claim has five elements: "(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and

---

[15] Moreover, Defendants withholding the Quarterly Payments was not wrongful or "unjust."  See Iliadis, 191 N.J. 110. As described above, Defendants' Quarterly Payment obligations were extinguished when Earth Color defaulted on the Lease, Defendants promptly initiated proceedings to collect past rent due, and Defendants and Earth Color reached a good faith settlement.  See supra Section IV.A.

(3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." RNC Sys. Inc., 861 F. Supp. at 451 (citation omitted).

Here, Defendants allege that Owners Corp. materially misrepresented the fact that Earth Color was willing to enter into a $2 million Lease termination agreement in order to induce Defendants to enter into the Sales Agreement, even though they knew this representation was false because only Bank of America had authority to do so. See Counterclaim ¶¶ 23-25. They also claim that Owners Corp. and Plaintiff misrepresented Earth Color's "viability" as a tenant and its "intention to continue paying rent in accordance with" the Lease. Id. ¶ 24. Defendants allegedly relied on these representations to their detriment in two ways, believing either that they (1) would pay the lower purchase price ($7.6 million) for the Property, because Earth Color and Owners Corp. would enter into a $2 million termination agreement prior to the closing, see Sales Agreement § 1.2(a)(ii); or (2) would pay $8.1 million at closing, plus the $900,000 Escrow Fund, see id. § 1.2(a)(i), to take the Property with Earth Color as a viable tenant, see Counterclaim ¶ 26; Def. Opp. Br. at 21-23, ECF No. 79. Instead, Defendants paid the higher price for the Property, and Earth Color immediately defaulted on the Lease.

Defendants have offered evidence to support these allegations. For example, on April 21, 2016, Nicholas—who worked for both Owners Corp. and Earth Color—forwarded Defendants the proposed Lease termination from Modugno, Earth Color's CFO.[16] See April 21 Email at 1; Def. SOMF ¶ 12. Nicholas "did not disclose" that "Modugno lacked authority to enter into this purported Termination Agreement because Bank of America was actually in control of Earth

---

[16] Nicholas had previously been involved in the sales negotiations, sending Rosen an email on March 29, 2016 with "three purchase options to consider" for the Property, which closely mirror the ultimate price and terms in the Sales Agreement. See Def. SOMF ¶ 8; compare March 29 Email at WIP00095-96 with Sales Agreement § 1.2.

Color." Id. ¶ 13; Pl. Resp. to Def. SOMF ¶ 13.[17]  Specifically, Nicholas testified that at this time, "no one could really make any decisions without Bret [Kossman, Bank of America's representative on Earth Color's Board of Directors]."  Nicholas Dep. Tr. at 177:2-9.[18]  Additionally, Stephen Santola, Defendants' Executive Vice President, certified that Earth Color's "willingness to pay a $2 million termination fee was a persuasive inducement to WIP to pay the higher purchase price." Santola Decl. ¶ 18.

Plaintiff argues that Defendants could not have reasonably relied on these representations "in light of their extensive due diligence."  Pl. Br. at 16, 18-19 (collecting due diligence activities, including Defendants producing and analyzing "valuation scenarios in which, inter alia, [the Property] was vacant and in which Tenant declared bankruptcy" during the Sales Agreement negotiations).  The Court concludes that the issue of whether Defendants relied on these representations, and whether that reliance was reasonable, is a fact issue inappropriate for resolution on summary judgment.  See DirecTech Delaware, Inc. v. Allstar Satellite, Inc., No. 08-3527, 2010 WL 1838573, at *6 (D.N.J. May 6, 2010) (collecting cases and denying summary judgment because "[t]he consensus of courts appears to be that the question of whether [a party] relied on a misrepresentation, and whether that reliance was reasonable, is a question of fact best reserved for the jury").

Plaintiff's arguments that the economic loss doctrine and non-reliance clauses in the Sales Agreement bar this counterclaim, see Pl. Br. at 21-24, are not persuasive.  First, as explained above,

---

[17] Because Earth Color was "unable to pay it[s debt] back" to Bank of America, Nicholas Brusco Deposition Transcript ("Nicholas Dep. Tr.") at 177:2-9, Kaller Decl., Ex. B, ECF No. 71.6, the Bank "converted their debt [in Earth Color] to equity" and received a position on the Board of Directors, id. at 176:19-23.  Nicholas described Earth Color as "bank owned" during the time the parties negotiated and entered into the Sales Agreement.  Id. at 22:2-3.

[18] Nicholas subsequently told Modugno that Earth Color "can have no contact with" Defendants.  Def. SOMF ¶ 16; Kaller Decl., Ex. F, ECF No. 71.7.

"only those pre-contractual misrepresentations that are <u>extraneous</u> to the parties' contract may be brought alongside a breach of contract claim." <u>Montclair State Univ.</u>, 2012 WL 3647427, at *4 (emphasis in original) (citation omitted).  Here, the alleged misrepresentations are "unrelated to the performance of the" Sales Agreement and "precede the actual commencement of the [A]greement." <u>Id.</u> at *5 (citing <u>Chen</u>, 2010 WL 4721514, at *8).  That is, Earth Color's ability to pay rent or terminate the Lease is distinct from any of Plaintiff's obligations under the Sales Agreement, and Nicholas's representations were made before the parties entered into the Sales Agreement on May 6, 2016, <u>see</u> Def. SOMF ¶ 17.

Second, where a fraudulent inducement claim <u>is</u> extrinsic to the contract, "'a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract.'" <u>RNC Sys. Inc.</u>, 861 F. Supp. 2d at 453 (quoting <u>Ocean Cape Hotel Corp. v. Masefield Corp.</u>, 63 N.J. Super. 369, 377-78 (App. Div. 1960)).  Therefore, the Sales Agreement's provision that the parties "are not bound by any . . . representations . . . other than as are expressly set forth and stipulated in this agreement," Sales Agreement § 4.4(a), does not bar Defendants' fraudulent inducement counterclaim, <u>see</u> <u>Ocean Cape Hotel</u>, 63 N.J. Super. at 377-82; <u>Walid v. Yolanda for Irene Couture, Inc.</u>, 425 N.J. Super. 171, 185-86 (App. Div. 2012) (finding that "party perpetrating a fraud may not invoke a general 'no representation' clause to preclude evidence of earlier explicit misrepresentations") (citation omitted).   The Court denies summary judgment on Counterclaim I.

### 2.      Tortious Interference with Contract (Counterclaim II)

To establish a claim for tortious interference with contract, a plaintiff must establish: "(1) the existence of the contract[;] (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages." <u>Inventiv</u>

Health Consulting, Inc. v. Atkinson, No. 18-12560, 2019 WL 6522742, at *4 (D.N.J. Dec. 4, 2019) (citing Amgro, Inc. v. Lincoln Gen. Ins. Co., 361 F. App'x 338, 345 n.9 (3d Cir. 2010)).  As with fraudulent inducement, the economic loss doctrine bars a tortious interference claim "when entitlement to losses only flows from a contract."  Id. (citing Travelers Indem. Co. v. Dammann & Co., Inc., 594 F.3d 238, 244 (3d Cir. 2010)).

Here, Defendants' allegations demonstrate that their tortious interference claim flows directly from the Sales Agreement.  Defendants allege that Plaintiff "wrongfully objected to the Escrow Agent's return of the Letter of Credit" to Defendants.  See Counterclaim ¶¶ 28-29. Disputes regarding payments from the Escrow Fund are governed by the Sales Agreement. See Sales Agreement § 12.23(b); see also id., Ex. K (the "Deferred Payment Escrow Agreement") (explaining that "[i]n the event of an dispute between the parties regarding the draw or delivery of the [Quarterly Payments or Escrow Fund] . . . Escrowee . . . shall disregard all instructions received . . . until the dispute is resolved and Escrowee is advised of this fact in writing by [Owners Corp.] and [Defendants], or Escrowee is otherwise instructed by a final unappealable judgment of a court of competent jurisdiction").  As previously noted, it is undisputed that the Sales Agreement (and its exhibits, including the Deferred Payment Escrow Agreement), is a valid contract.  See supra Section IV.A.  Accordingly, because Defendants' tortious interference counterclaim "is nothing more than a contract claim in tort claim clothing," it is barred by the economic loss doctrine as a matter of law and Plaintiff is entitled to summary judgment.  See Dando v. Bimbo Food Bakeries Distrib., LLC, No. 14-2956, 2017 WL 1362022, at *3 (D.N.J. Apr. 10, 2017) (citing SRC Constr. Corp. of Monroe v. Atlantic City Hous. Auth., 935 F. Supp. 2d 796, 801 (D.N.J. 2013)).

## V.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 71, is

**GRANTED**.

Plaintiff's Cross-motion for Summary Judgment, ECF No. 72, is **GRANTED** as to

Counterclaim II but otherwise **DENIED**.  Counterclaim I may proceed.  An appropriate Order

follows.

Dated: 09/01/2020

*/s Madeline Cox Arleo*

HON. MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE